## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| BRYCE KUHAR, Derivatively on Behalf of MAMMOTH ENERGY SERVICES, INC., | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Case No. CIV-19-817-G |
| ARTY STRAEHLA, MARK LAYTON, MARC MCCARTHY, PAUL HEERWAGEN, ARTHUR SMITH, MATTHEW ROSS, JAMES PALM AND ARTHUR AMRON | ) ) **VERIFIED STOCKHOLDER** ) **DERIVATIVE COMPLAINT FOR** ) **VIOLATIONS OF SECURITIES LAWS,** ) **BREACH OF FIDUCIARY DUTY,** ) **WASTE OF CORPORATE ASSETS,** ) **AND UNJUST ENRICHMENT** |
| Defendants, | ) ) **JURY TRIAL DEMANDED** |
| -and- | ) ) |
| MAMMOTH ENERGY SERVICES, INC., a Delaware corporation, | ) ) ) |
| Nominal Defendant. | ) ) ) |

Plaintiff Bryce Kuhar ("Plaintiff"), by his attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant Mammoth Energy Services, Inc. ("Mammoth" or the "Company") against the members of its board of directors (the "Board") and members of upper management. The wrongdoing alleged herein has caused substantial damage to Mammoth's reputation, goodwill, and standing in the business community.  It has also exposed Mammoth to substantial, potential liability for violations of federal securities laws and the costs associated with defending itself.

2.      Mammoth is an oilfield and infrastructure service company operating in three areas: Infrastructure Services, Pressure Pumping Services, and Natural Sand Proppant Services. The Company serves government-funded operations, private and public investor owned operations, co-operative utilities, independent oil and natural gas companies and land-based drilling contractors in North America.

3.      Premised on the existence of a contract between its subsidiary, Cobra Acquisitions LLC ("Cobra"), and the Puerto Rico Electric Power Authority ("PREPA") for repairs to PREPA's electrical grid as a result of Hurricane Maria ("the Agreement"), the Company's officers and directors caused the company to file false financial information with the SEC during the relevant period regarding the Agreement and expected remuneration to the Company of an anticipated $1.8 Billion.  The documents filed with the SEC were riddled with falsities and misrepresentations.  Indeed, these materials were based on false assertions that the contract to secure business with PREPA was properly entered, and not tainted by any improper dealings.

4.     The Agreement, however, was tainted by improper dealings. Specifically, on May 24, 2019, *The Wall Street Journal* published an article entitled *FEMA Official Probed Over Puerto Rico Power Restoration,* which reported the Federal Emergency Management Agency ("FEMA") Deputy Regional Administrator, who oversaw FEMA's response to the damage wrought by Hurricane Maria, was under investigation by the Department of Homeland Security ("DHS"), relieved of her duties and placed on administrative leave over allegations that she steered work to Cobra. *The Wall Street Journal* further published an article entitled *Puerto Rico Grid Contractor Caught Up in Federal Probes*, reporting that the Federal Bureau of Investigation had "opened a related criminal inquiry" into the origin of the Agreement. The DHS Inspector General, which conducts investigations into FEMA*,* has probed her interactions with Cobra, and whether Cobra gained an improper advantage in the contracting process, according to the article.

5.     Following the release of this information to the investing public, the Company's shares declined $1.25 per share or over 10% over the next three trading days on unusually high volume to close at $10.99 per share on May 29, 2019, damaging shareholders. The Company's shares dropped a further $5.09 per share or over 45% over the next two trading days to close at $6.11 per share on June 6, 2019, further damaging investors.

6.     As detailed herein and in the federal securities class actions pending in this district styled *Normantas v. Mammoth, et al.,* Case 5:19-cv-00560-SLP (the "Securities Action"), the officers and directors greatly damaged Mammoth by causing it to file false and misleading statements that omitted material adverse facts. Throughout the relevant

period, those defendants caused harm to the Company by compelling it to issue statements that failed to disclose to investors: that: (1) Mammoth's subsidiary, Cobra, improperly obtained two infrastructure contracts with PREPA that totaled over $1.8 billion; (2) specifically, the contracts were awarded as the result of improper steering and not a competitive RFP process; and (3) as a result, Defendants' statements about Mammoth's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

7.      In addition, in the secondary offering that took place in June 2018, the Company's controlling stockholders sold more than $166 million worth of the Company's common stock at an inflated price.

### JURISDICTION AND VENUE

8.      Pursuant to 28 U.S.C. §1331 and Section 27 of the Securities and Exchange Act of 1934 ("Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 14(a) of the Exchange Act and SEC Rule and 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

9.      This Court has jurisdiction over each Defendant named herein because each is either a corporation that conducts business in and or maintains operations in this District or is an individual with sufficient contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

10.      Venue is proper in this Court in accordance with 28 U.S.C. §1391 because:

(i) Mammoth maintains its principal place of business in this District; (ii) one or more of the Defendants either resides or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Mammoth, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

11.     Plaintiff Bryce Kuhar is and has continuously been a stockholder of Mammoth during the wrongdoing complained of herein.

**Nominal Defendant**

12.     Nominal Defendant Mammoth is a Delaware corporation and its principal executive offices are located at 14201 Caliber Drive, Suite 300, Oklahoma City, Oklahoma, 73134. The Company is an energy services company serving companies engaged in the exploration and development of North American onshore unconventional oil and natural gas reserves as well as government-funded utilities, private utilities, public investor owned utilities and co-operative utilities engaged in energy infrastructure. Mammoth securities trade on the NASDAQ under the ticker symbol "TUSK."

13.     The Company was incorporated in Delaware in June 2016 as a wholly-owned subsidiary of Mammoth Energy Partners, LP, a Delaware limited liability company (the "Mammoth Partnership"). The Mammoth Partnership was originally formed by Wexford

Capital LP ("Wexford") in February 2014 as a holding company under the name Redback Energy Services Inc. and was converted to a Delaware limited partnership in August 2014. On November 24, 2014, Mammoth Energy Holdings, LLC ("Mammoth Holdings," an entity controlled by Wexford), Gulfport Energy Corporation ("Gulfport") and Rhino Resource Partners LP ("Rhino") contributed their interests in certain of the entities to the Partnership in exchange for 20 million limited partner units. Mammoth Energy Partners GP, LLC (the "General Partner") held a non-economic general partner interest in the Mammoth Partnership.

14.     In October 12, 2016, the Mammoth Partnership was converted into a Delaware limited liability company named Mammoth Energy Partners LLC ("Mammoth LLC"), and then Mammoth Holdings, Gulfport and Rhino, as all the members of Mammoth LLC, contributed their member interests in Mammoth LLC to the Company. Prior to the conversion and the contribution, the Company was a wholly-owned subsidiary of the Mammoth Partnership. Following the conversion and the contribution, Mammoth LLC (as the converted successor to the Mammoth Partnership) was a wholly-owned subsidiary of the Company. The Company did not conduct any material business operations until Mammoth LLC was contributed to it. On October 19, 2016, Mammoth Inc. closed its initial public offering of 7,750,000 shares of common stock (the "IPO"), which included an aggregate of 250,000 shares that were offered by Mammoth Holdings, Gulfport and Rhino, at a price to the public of $15.00 per share.

15.     The Company is currently controlled by Wexford and Gulfport. As of April 1, 2019, Wexford owned 21,988,473 shares, or 49%, and, Gulfport owned 9,826,893

shares, or 21.9%, of the Company's common stock.

**Individual Defendants**

16.     Defendant Arty Straehla ("Straehla") has been the Company's Chief Executive Officer ("CEO") and member of the Board of Directors since June 3, 2016. Straehla served as chief executive officer of the General Partner from February 2016 until October 2016. According to the Company's 2019 Proxy, he owns 103,775 of shares of common stock and 83,334 shares of restricted stock units.  He was paid approximately $2.8 million for his services to the Company in 2017 and 2018.

17.     Defendant Mark Layton ("Layton) has been the Company's Chief Financial Officer ("CFO") since June 3, 2016. Layton also served as chief financial officer of the General Partner from August 2014 until October 2016. According to the 2019 Proxy, he owns 30,732 shares of common stock, 7,500 shares of restricted stock units.  He was paid approximately $2.5 million for his services to the Company in 2017 and 2018.

18.     Defendant Marc McCarthy ("McCarthy") has served as Chairman of the Board of Directors of Mammoth since June 3, 2016 and served as chairman of the board of directors of the General Partner September 2014 until October 2016. McCarthy joined Wexford in June 2008 and currently is a Partner at Wexford. He received $238,576 in compensation for 2018, which consisted of $75,000 in fees earned or paid in cash and $163,576 in stock awards.

19.     Defendant Paul Heerwagen ("Heerwagen") has been a director of the Company since January 2017. Heerwagen serves as Senior Vice President of Corporate Development and Strategy for Gulfport, one of the Company's controlling

stockholders. Since joining Gulfport in May 2007, Heerwagen has served in multiple roles, including as the Director of Investor Relations and Corporate Affairs. He received $233,576 in compensation for 2018, which consisted of $70,000 in fees earned or paid in cash and $163,576 in stock awards.

20.     Defendant Arthur Amron ("Amron") has been a director of the Company since January 2019. Amron is a Partner at Wexford Capital and serves as its General Counsel. Amron also served on the board of directors of the general partner of Rhino, from January 2010 until the sale of Wexford Capital's interest in Rhino to Royal Energy Resources, Inc. in March of 2016.

21.     Defendant James Palm ("Palm") has been a director of the Company since June 2017. Palm served as a director of Gulfport from February 2006 and as chief executive officer of Gulfport from December 2005, in each case until his retirement in February 2014. According to the 2019 Proxy, he owns 17,070 shares of common stock. He received $280,357 in compensation for 2018, which consisted of $85,000 in fees earned or paid in cash and $195,357 in stock awards.

22.     Defendant Arthur Smith ("Smith") has been a director of the Company since October 2016. According to the 2019 Proxy, he owns 9,580 shares of common stock. He received $253,576 in compensation for 2018, which consisted of $90,000 in fees earned or paid in cash and $163,576 in stock awards.

23.     Defendant Matthew Ross ("Ross") has been a director of the Company since November 7, 2016. According to the 2019 Proxy, he owns 9,580 shares of common stock. He received $238,576 in compensation for 2018, which consisted of $75,000 in fees earned

or paid in cash and $163,576 in stock awards.

24.     Defendants Straehla, McCarthy, Heerwagen, Smith, Ross, Palm and Amron above are collectively referred to herein as the "Director Defendants."

25.     The Director Defendants and Defendant Layton are collectively referred to as the "Individual Defendants" where it is appropriate to do so.

## SUBSTANTIVE ALLEGATIONS

**I.     The PREPA Contracted the Company to Rebuild Puerto Rico's Energy Infrastructure**

26.     On October 19, 2017, Mammoth published in a press release that its subsidiary, Cobra, reached an agreement with the PREPA to rebuild Puerto Rico's energy infrastructure (the "Initial PREPA Contract"):

> Mammoth Energy Services, Inc. ("Mammoth") (NASDAQ: TUSK) today announced that its wholly owned subsidiary, Cobra Acquisitions LLC, has signed a contract to aid in the restoration of utility infrastructure on the island of Puerto Rico. Cobra, a utility infrastructure business focused on the repair and construction of transmission and distribution (T&D) networks, will perform the work. The contract will commence immediately and is expected to generate revenue of up to $200 million over the initial 120 days.

> Arty Straehla, Mammoth's Chief Executive Officer, stated, "We are honored to be chosen to help restore the electric utility infrastructure for the residents of Puerto Rico. After witnessing the destruction from Hurricane Maria first hand last weekend, where 85% of Puerto Rico's residents are currently living without electricity, we intend to work quickly both to help rebuild the electric grid and to help restore normalcy to people's lives."

> The work to be provided by Cobra includes the following:

> - Comprehensive damage assessment of existing electrical grid.
> - Engineering services to aid in the design of a new electric utility grid to Puerto Rico Electric Power Authority (PREPA) specifications.
> - Construction services to rebuild the electric grid.
> - Fully self-contained solution including all operational and life support

related to operating within the disaster area without creating an
additional strain on the local population.

The initial mobilization of construction equipment and personnel is expected
to begin in the coming days with people currently in place performing an
initial damage and engineering assessment to determine the full scope of
work required. This contract will be incremental to Mammoth's existing
energy service operations.

27.     The U.S. government and the press immediately scrutinized the Initial

PREPA Contract was by. On October 31, 2017, *The Intercept* published an article entitled

"*There's a Shady Puerto Rico Contract You Didn't Hear About,*" (the "Intercept Article")

reporting that "Cobra's creation is Mammoth's first foray into the utility sector." Cobra

was created when Mammoth acquired two small transmission and distribution companies

for around $8 million earlier in 2017.  The Intercept Article further reported that the

Company did not offer much detail on how the Initial PREPA Contract originally came

about. According to the Company's statement shortly after the Initial PREPA Contract was

signed, "[Mammoth's] leadership team went to Puerto Rico proactively to meet the

authorities there and offer our services and expertise."

28.     On November 6, 2017, *CNN* published an article entitled "*Here's the other

small firm that won a big Puerto Rico power deal,*" (the "CNN Article") reporting that the

Cobra deal is "one of two major contracts greenlighted by PREPA that have come under

scrutiny on Capitol Hill since recovery efforts began on the island over a month ago." The

CNN Article also reported that "PREPA, the embattled state-owned utility led by executive

director Ricardo Ramos, has faced scrutiny over how these fledgling companies won such

lucrative deals over larger, more established utilities," and that "many question whether

PREPA followed the appropriate steps in awarding the contracts."

29.     The CNN Article further reported that Representative Peter DeFazio, a Democrat from Oregon, asked Brock Long, the head of the FEMA, at a House hearing whether he or anyone at FEMA approved the Cobra contract or the prior but canceled Whitefish Energy Contract. Long's response was that "There's not a lawyer within FEMA that would have ever approved that contract." Long also added ominously that "it was not our contract [a]nd the other thing to be clear here is we don't approve contracts." Defendant Straehla, however, had told analysts on an October 20, 2017, conference call that FEMA was "in the room" and involved in "every step of the way" when PREPA was crafting the deal with Cobra. For its part, FEMA declined to address whether it participated in the discussions, and, instead, told CNN that Cobra's contract was "solely between PREPA and the other party."

30.     As part of its deal with PREPA, Defendant Straehla said Cobra agreed to provide accommodations, freshwater generation and medical facilities for its workers. PREPA agreed to pay Cobra $15 million upfront to cover the costs of mobilizing forces to the island, he said. It was unclear, however, how PREPA could afford that upfront payment, when only a few weeks earlier, the bankrupt utility, which is $9 billion in debt, said it picked Whitefish Energy over another contender: PowerSecure, a subsidiary of Southern Co., because it couldn't afford to pay the $25 million down payment the PowerSecure demanded. Defendant Straehla further assured investors that the Company will be paid twice weekly and said, "Quite honestly, we wouldn't have entered this contract if we didn't think we'd get paid, and we feel very, very strongly about that."

31.    On November 3, 2017, *The Atlantic* published an article entitled "*The Puerto Rico Power Scandal Expands,*" (the "Atlantic Article") which reported that on November 1, 2017, House Committee on Energy & Commerce sent a letter criticizing the Initial PREPA Contract "which would appear to have the effect of preventing government oversight of the agreement, [raising] additional questions about the contracting review process," including FEMA's role in contracts paid out with its funds. The Atlantic Article further reported that the Initial PREPA Contract reflected ongoing concerns with the PREPA decision-making process after Hurricane Maria, and asked the following questions: "Just how did it come to terms with those companies? What exactly was its bidding process? Why did it choose to enter into expensive contracts with private companies instead of entering into the mutual-aid agreements usually favored by utility companies, which allows them to contract with other utility companies in other states for rebuilding services?"

32.    On December 1, 2017, The Committee on Homeland Security and Governmental Affairs of The United States Senate sent the letter (the "CHS Letter") to Defendant Straehla requesting the Company provide detailed information and documents with respect to bidding, negotiation and execution of the Initial PREPA Contract, including information concerning FEMA's or any other federal agency's involvement in the process. The CHS Letter further stated that the committee "is concerned about the company's apparent attempt to circumvent federal oversight." The CHS letter raised a concern about a provision in the Initial PREPA Contract prohibiting PREPA, the Commonwealth of Puerto Rico, the FEMA Administrator, or the Controller General of the United States from

having the right to audit or review the cost and profit elements of labor rates specified in the Initial PREPA Contract. The CHS Letter stated that such provision is in direct conflict with both PREPA's and FEMA's obligations.

33.     Notwithstanding the pointed scrutiny, on January 28, 2018, Cobra and PREPA amended the Initial PREPA Contract to increase the total contract amount by an additional $245.4 million to a total of $445.4 million. On February 27, 2018, Cobra and PREPA again amended their contract to increase the total contract amount by an additional $500.0 million to a total of $945.4 million. In addition to continuing with its repair and restoration work, under the terms of this amendment Cobra would have the ability to source construction materials needed to rebuild the electrical infrastructure in Puerto Rico on a pass-through basis.

34.     On May 26, 2018, Cobra entered into a new master services agreement with the PREPA to complete the restoration of the electrical transmission and distribution system components damaged by Hurricane Maria and to support the initial phase of reconstruction of the electrical power system in Puerto Rico (the "New PREPA Contract"). Cobra agreed to provide the labor, supervision, tools and materials necessary to provide the restoration and reconstruction services under the New PREPA Contract, which had a one-year term ending May 25, 2019 and provided for total payments not to exceed $900.0 million. According to the Company, the New PREPA Contract allegedly was awarded pursuant to a request for proposal ("RFP") bid process that began in February 2018. The New PREPA Contract was in addition to the Initial PREPA Contract, as subsequently amended, to provide restoration services to PREPA.

35.     PREPA   was   the   Company's   largest   customer   for   the   year ended December 31,  2018 accounting  for  approximately 60%  of  its  revenue  and  the second  largest  customer  for  the  year  ended December 31,  2017 accounting  for approximately 29% of the Company's revenue.

## II.     Insider Sales by Controlling Stockholders

36.     On June 29, 2018, Gulfport and MEH Sub LLC ("MEH Sub"), an entity controlled   by   Wexford,   (collectively,   the   "Selling   Stockholders")   completed   an underwritten secondary public offering (the "Secondary Offering") of 4,000,000 shares of the Company's common stock at a purchase price to the Selling Stockholders of $38.01 per share. The Selling Stockholders granted the underwriters an option to purchase up to an aggregate  of 600,000 additional  shares  of  the  Company's  common  stock  at  the  same purchase price. This option was exercised, in part, and on July 30, 2018, the underwriters purchased an additional 385,000 shares of common stock from the Selling Stockholders at the same price per share. The Selling Stockholders received all proceeds from this offering.

37.     Wexford  sold  3,030,426  shares  of  Mammoth  common  stock  for $115,186,492.  Gulfport  sold  1,354,574  shares  of  Mammoth  common  stock  for $51,487,357. Conveniently, the Secondary Offering took place shortly after the Company announced execution of the New PREPA Contract and when the Company's stock was traded at the highest price ever:



### III.   FEMA Official Probed for Steering Work to Cobra

38.   On May 24, 2019, *The Wall Street Journal* released an article "FEMA Official Probed Over Puerto Rico Power Restoration," which said the Federal Emergency Management Agency ("FEMA") Deputy Regional Administrator, who looked over FEMA's response to the damage wrought by Hurricane Maria, was under investigation by the Department of Homeland Security ("DHS"), relieved of her duties and placed on administrative leave over allegations that she steered work to Cobra. The article said:

> ***A high-ranking Federal Emergency Management Agency official who oversaw the reconstruction of Puerto Rico's electrical grid is under investigation by a government watchdog over allegations she steered work to a utility contractor, according to people familiar with the matter.***
>
> FEMA Deputy Regional Administrator Ahsha Tribble was relieved of her duties and placed on administrative leave last week amid a continuing probe by the Department of Homeland Security's Office of Inspector General, these people said.
>
> Ms. Tribble deployed to Puerto Rico after Hurricane Maria struck the U.S. island territory in September 2017 and spent the next year there coordinating FEMA's response to the storm-ravaged power system, according to her FEMA biography.
>
> ***The DHS Inspector General, which conducts investigations into FEMA,***

*has probed her interactions with Cobra Acquisitions LLC, a grid-construction contractor hired by Puerto Rico's public electric utility after the hurricane, people familiar with the matter said. The investigation has also focused on whether Cobra gained an improper advantage in the contracting process, they said.*

\*    \*    \*

A FEMA spokeswoman said the agency can't comment on personnel matters. The DHS Inspector General said it couldn't confirm or deny the existence of any probe.

Cobra's parent company didn't respond to requests for comment. Cobra signed separate contracts worth up to $900 million and $945 million to repair downed transmission and distribution lines with the bankrupt power monopoly known as Prepa, according to securities filings.

A Prepa spokeswoman said several utility officials and consultants were interviewed this week by Inspector General agents.

"It is a top priority for Prepa to assist and collaborate with investigations conducted by state or federal agencies," the spokeswoman said.

Cobra became Puerto Rico's primary general contractor for repairing the power grid in late 2017, filling a void in the power restoration efforts after the departure of another contractor, Whitefish Energy Holdings LLC.

Whitefish's contract with Puerto Rico came under intense scrutiny after FEMA raised concerns about how the $300 million deal was awarded and priced. Gov. Ricardo Rosselló canceled the Whitefish deal, and Puerto Rico increasingly came to rely on Cobra to turn the lights back on.

*But as Prepa's spending on contractors skyrocketed last year, utility officials raised concerns internally about Cobra's rates and why the company was doing so much of the power restoration work, according to people familiar with the matter.*

Ms. Tribble "wanted the work to get done and the power restored to Puerto Rico," Ms. Moore said. "Whoever did it, did it. She just wanted it to get done."

*Cobra has billed for more than $1.3 billion in emergency work through*

***May 10, more than half the utility's total emergency spending since the hurricane, according to public records.***

Ms. Tribble served in the National Security Council and Energy Department during the Obama administration and was involved in the White House response to disasters including Hurricanes Sandy and Irene and the deadly West, Texas, chemical plant explosion, according to her FEMA biography.

At a February 2018 meeting of Puerto Rico's financial oversight board, Ms. Tribble said it was challenging to get utility contractors to do business with Prepa after the storm given its strained public finances. Whitefish and Cobra each "took a risk" in mobilizing to the island, she said.

[Emphasis added.]

39.     Following the release of this information to the investing public, the Company's shares dropped $1.25 per share or over 10% over the next three trading days on unusually high volume to close at $10.99 per share on May 29, 2019, damaging shareholders.

40.     Subsequently on June 5, 2019, while the market was open for trading, *The Wall Street Journal* published an article entitled *Puerto Rico Grid Contractor Caught Up in Federal Probes*, saying that the Federal Bureau of Investigation "opened a related criminal inquiry" into the origin of Cobra's contracts with PREPA. Following this news, the Company's shares dropped $5.09 per share or over 45% over the next two trading days to close at $6.11 per share on June 6, 2019, further damaging investors.

## IV.    The Individual Defendants caused Company to Issue False and Misleading Statements

41.     On November 11, 2017, Mammoth lodged a Form 10-Q with the SEC, detailing its financial results and position for the fiscal quarter ending September 30, 2017 (the "3Q 2017 10-Q"). The 3Q 2017 10-Q was signed by Defendants Straehla and Layton.

Annexed to the 3Q 2017 10-Q were SOX certifications signed by Defendants Straehla and Layton attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. The 3Q 2017 10-Q reported with respect to the Company's contract with PREPA:

> On October 19, 2017, Cobra entered into a contract to aid in the restoration of utility infrastructure on the island of Puerto Rico. The contract provides for payments of up to $200.0 million, including an initial payment of $15.0 million at the time of signing. As of November 7, 2017, Cobra had entered into $32.7 million of commitments related to this contract and made prepayments and deposits of $12.6 million with respect to these commitments.

42.     On January 31, 2018, Mammoth lodged a Form 8-K with the SEC reporting that on January 28, 2018, "Cobra and PREPA amended the Initial PREPA Contract to increase the total agreement amount by an additional $245.4 million to a total of $445.4 million."

43.     On February 28, 2018, Mammoth filed its annual report on Form 10-K with the SEC, which stated its financial results and position for the fiscal year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by Defendants Straehla and Layton. and attached signed SOX certifications by Defendants Straehla and Layton attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. The 2017 10-K stated the following about the Company's contract with PREPA:

> We currently have agreements in place with government-funded utilities, private utilities, public IOUs and Co-Ops. In particular, on October 19, 2017, one of our subsidiaries, Cobra Acquisitions LLC, or Cobra, entered into an emergency master services agreement with PREPA (such agreement, as subsequently amended through December 21, 2017, is hereinafter referred to

as the initial PREPA contract). The initial PREPA contract has a one-year term and provided for up to $200.0 million of services which was initially expected to be fully utilized within a 120-day period. The scope of the work provided for in the initial PREPA contract included labor, supervision, tools and equipment to perform storm repairs at various locations in Puerto Rico. The initial PREPA contract was fully applied to services performed by Cobra as of January 3, 2018. Due to the continuing need for Cobra's services, on January 28, 2018, Cobra and PREPA amended the initial PREPA contract to increase the total contract amount by an additional $245.4 million up to a total of $445.4 million. Under the terms of this amendment, the number of workers requested by PREPA and provided by Cobra increased to at least 882, up from 434 in the initial PREPA contract, and the billable daily rate for those workers was decreased. On February 27, 2017, Cobra and PREPA again amended the PREPA contract to further increase the contract amount by $500.0 million up to a total of $945.4 million. In addition to continuing its repair and restoration work, under the terms of this amendment Cobra will be able to source construction materials needed to rebuild the electrical infrastructure in Puerto Rico on a pass- through basis. To support its efforts, Cobra has two berthing barges with accommodations for approximately 550 people mobilized to Puerto Rico. In addition to its employees, Cobra also subcontracts additional resources where needed to assist in its repair efforts, including helicopters and pilots to erect towers and pull wire for reconnection, steel workers to fix transmission poles and rework steel damaged in the storm, road equipment and operators to carve access to work sites, tree services to clear brush and trees and security teams. Based on the current level of services provided, Cobra anticipates the additional amounts specified in the amendments will fund its activities in Puerto Rico through mid-2018.

44.     On May 4, 2018, Mammoth filed a Form 10-Q with the SEC, which provided its financial results and position for the fiscal quarter ended September 30, 2018 (the "1Q 2018 10- Q"). The 1Q 2018 10-Q was signed by Defendants Straehla and Layton. and contained signed SOX certifications by Defendants Straehla and Layton attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. The 1Q 2018 10-Q said the following concerning the Company's contract with PREPA:

On October 19, 2017, our wholly owned subsidiary Cobra Acquisitions LLC, or Cobra, entered into an emergency master services agreement with PREPA for repairs to PREPA's electrical grid as a result of Hurricane Maria. During the first quarter of 2018, we executed two amendments to the contract, increasing the total contract value to $945.4 million from $200.0 million originally. At March 31, 2018, we had approximately 1,000 people, and approximately 600 pieces of equipment, deployed in Puerto Rico.

45.     On May 29, 2018, Mammoth published in a press release reporting that

Cobra had entered into a second, $900 million contract with PREPA:

OKLAHOMA CITY, May 29, 2018 (GLOBE NEWSWIRE) -- Mammoth Energy Services, Inc. ("Mammoth") (NASDAQ:TUSK) today announced that its wholly owned subsidiary, Cobra Acquisitions LLC ("Cobra"), signed a one-year $900 million contract with the Puerto Rico Electric Power Authority ("PREPA") to complete the restoration of the critical electrical transmission and distribution system components damaged as a result of Hurricane Maria as well as to support the initial phase of reconstruction of the electrical power system in Puerto Rico. Cobra has been working to restore electrical services in Puerto Rico since October 2017.

**Request for Proposal (RFP) Process**

In mid-February, the Commonwealth of Puerto Rico began a competitive RFP bid process (RFP #77844) to complete the restoration of critical electrical system components and to support the initial reconstruction phase of its electrical utility system following the impact of Hurricane Maria. ***This process involved the submission of bids from qualified infrastructure construction companies and an analysis by PREPA of each bidder's experience, asset base, financial capacity, understanding of the project and overall cost to perform the work needed. After concluding the selection process, Cobra entered into a contract with PREPA on May 26, 2018.***

**Restoration and Reconstruction Contract**

Under the terms of the contract, Cobra is to perform hurricane restoration and reconstruction services at various locations in PREPA's service area. Cobra is increasing its total resource count in Puerto Rico to expedite the completion of the restoration process. As the restoration process comes to an end, Cobra will continue to work with the Commonwealth of Puerto Rico, PREPA and various other federal and Commonwealth agencies to transition to the long task of reconstructing the Puerto Rico power grid of the future.

This contract award is in addition to the original contract to provide restoration services that Cobra entered into in October 2017, as amended.

Arty Straehla, Mammoth's Chief Executive Officer, stated, "We are very proud of our Cobra team in Puerto Rico and look forward to continuing our relationship with the Commonwealth of Puerto Rico, PREPA and the citizens of Puerto Rico. Through the team's hard work, professionalism and technical ability, we have been selected to lead this very important effort to complete the restoration phase and transition to the reconstruction phase of the electric utility system in Puerto Rico, which is expected to last for several years. The reconstruction of the electric utility infrastructure will improve the reliability and quality of service for the citizens of Puerto Rico."

[Emphasis added.]

46.    On August 8, 2018, Mammoth lodged a Form 10-Q with the SEC, which stated its financial results and financial position for the fiscal quarter which finished June 30, 2018 (the "2Q 2018 10-Q"). The 2Q 2018 10-Q was signed by Defendants Straehla and Layton. The 2Q 2018 10-Q also contained signed SOX certifications by Defendants Straehla and Layton attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. The 2Q 2018 10-Q stated the following concerning the Company's contracts with PREPA:

On May 26, 2018, our wholly owned subsidiary Cobra Acquisitions LLC, or Cobra, entered into a new master services agreement with the Puerto Rico Electric Power Authority, or PREPA, to complete the restoration of the electrical transmission and distribution system components damaged by Hurricane Maria and to support the initial phase of reconstruction of the electrical power system in Puerto Rico, which we refer to as the New PREPA Contract. Cobra has agreed to provide the labor, supervision, tools and materials necessary to provide the restoration and reconstruction services under the New PREPA Contract, which has a one-year term ending May 25, 2019 and provides for total payments not to exceed $900.0 million.

The New PREPA Contract was awarded at the conclusion of a request for

proposal (RFP) bid process that began in February 2018. ***The New PREPA Contract is in addition to the contract that Cobra entered into in October 2017, as subsequently amended, to provide restoration services to PREPA.***

[Emphasis added.]

47.    On November 2, 2018, Mammoth filed a Form 10-Q with the SEC, which reported its financial results and position for the fiscal quarter ended September 30, 2018 (the "3Q 2018 10-Q"). The 3Q 2018 10-Q was signed by Defendants Straehla and Layton and contained signed SOX certifications by Defendants Straehla and Layton attesting to its accuracy and the disclosure of any material financial information. With respect to the Company's contract with PREPA, the 3Q 2018 10-Q reported:

> In 2017, we expanded into the electric infrastructure business, offering both commercial and storm restoration services to government-funded utilities, private utilities, public investor owned utilities and cooperatives. Since we commenced operations in this line of business, substantially all of our infrastructure revenues have been generated from storm restoration work, primarily from PREPA due to damage caused by Hurricane Maria. On October 19, 2017, Cobra and PREPA entered into an emergency master services agreement for repairs to PREPA's electrical grid. The one-year contract, as amended, provides for payments of up to $945.4 million. On May 26, 2018, Cobra and PREPA entered into a new one-year $900.0 million master services agreement to provide additional repair services and begin the initial phase of reconstruction of the electrical power system in Puerto Rico. PREPA is currently subject to bankruptcy proceedings pending in the U.S. District Court for the District of Puerto Rico. As a result, PREPA's ability to meet its payment obligations under the contract will be largely dependent upon funding from the Federal Emergency Management Agency or other sources. In the event PREPA does not have or does not obtain the funds necessary to satisfy its obligations to Cobra under the contracts, terminates the contracts, curtails our services prior to the end of the contract terms or otherwise fails to pay amounts owed to us for services performed, our financial condition, results of operations and cash flows would be materially and adversely affected. In addition, government contracts are subject to various uncertainties, restrictions and regulations, including oversight audits by government representatives and profit and cost controls, which could result in withholding or delayed payments to us or efforts to recover

payments already made.

48.     On March 18, 2019, Mammoth filed a Form 10-K with the SEC which reported the Company's financial results and position for the fiscal year ending December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Straehla and Layton. The 2018 10-K contained signed SOX certifications by Defendants Straehla and Layton attesting to its accuracy. The 2018 10-K stated the following about the Company's contracts with PREPA:

> We currently have agreements in place with government-funded utilities, private utilities, public IOUs and Co-Ops. To date, substantially all of our infrastructure services have been performed in Puerto Rico under two emergency master services agreements entered into by one of our subsidiaries, Cobra Acquisitions LLC, or Cobra, with PREPA for up to an aggregate of approximately $1.8 billion of services. The scope of the work contemplated by these agreements includes labor, supervision, tools, equipment and materials to perform storm repair, restoration and reconstruction services at various locations in Puerto Rico. Cobra performed the full $945 million of services under the initial contract as of July 21, 2018. The second contract with PREPA has a one-year term ending on May 25, 2019 and provides for total payments not to exceed $900 million. As of December 31, 2018, and March 8, 2019, Cobra had performed an aggregate of $280 million and $354 million, respectively, of services under the second contract. Although we continue to perform services under the second contract, we expect these services will end by March 31, 2019, and we do not expect that any further work orders will be issued to Cobra under this contract prior to the May 25, 2019 termination date.

49.     On May 3, 2019, Mammoth lodged a Form 10-Q with the SEC, which detailed its financial results and position for the fiscal quarter ended March 31, 2019 (the "1Q 2019 10-Q"). The 1Q 2019 10-Q was signed by Defendants Straehla and Layton. The 1Q 2019 10-Q contained signed SOX certifications by Defendants Straehla and Layton attesting to its accuracy. The 1Q 2019 10-Q reported the following with respect to the

Company's contracts with PREPA:

> In 2017, we expanded into the electric infrastructure business, offering both commercial and storm restoration services to government-funded utilities, private utilities, public investor owned utilities and cooperatives. Since we commenced operations in this line of business, substantially all of our infrastructure revenues have been generated from storm restoration work, primarily from PREPA due to damage caused by Hurricane Maria. On October 19, 2017, Cobra and PREPA entered into an emergency master services agreement for repairs to PREPA's electrical grid. The one-year contract, as amended, provides for payments of up to $945.4 million. On May 26, 2018, Cobra and PREPA entered into a new one-year, $900.0 million master services agreement to provide additional repair services and begin the initial phase of reconstruction of the electrical power system in Puerto Rico. PREPA is currently subject to bankruptcy proceedings pending in the U.S. District Court for the District of Puerto Rico. As a result, PREPA's ability to meet its payment obligations under the contract will be largely dependent upon funding from the Federal Emergency Management Agency or other sources. In the event PREPA does not have or does not obtain the funds necessary to satisfy its obligations to Cobra under the contracts, terminates the contracts, curtails our services prior to the end of the contract terms or otherwise fails to pay amounts owed to us for services performed, our financial condition, results of operations and cash flows would be materially and adversely affected. In addition, government contracts are subject to various uncertainties, restrictions and regulations, including oversight audits by government representatives and profit and cost controls, which could result in withholding or delayed payments to us or efforts to recover payments already made.

50.     The statements referenced in Paragraphs 41-49 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Mammoth's subsidiary, Cobra, improperly obtained two infrastructure contracts with PREPA that totaled over $1.8 billion; (2) specifically, the contracts were awarded as the result of improper steering and not a

competitive RFP process; and (3) as a result, Defendants' statements about Mammoth's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## V.   The Individual Defendants Issued a Materially False and Misleading Proxy Statement

51.   In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants also caused the Company to issue a false and misleading proxy statement, which sought stockholder votes for director re-election.

52.   On April 26, 2019, the Director Defendants caused the Company to file its 2019 Proxy Statement with the SEC pursuant to Section 14(a) of the Exchange Act seeking their respective elections as directors for one-year terms. The 2019 Proxy Statement, however, contained material misstatements and omissions.[1]

53.   The 2019 Proxy Statement contained the following concerning the Company's Code of Business Conduct and Ethics:

> We have adopted a Code of Business Conduct and Ethics designed to help directors and employees resolve ethical issues. Our Code of Business Conduct and Ethics applies to all directors and employees, including the Chief Executive Officer, the Chief Financial Officer, controller and persons performing similar functions. The Code of Business Conduct and Ethics covers various topics including, but not limited to, conflicts of interest, fair dealing, discrimination and harassment, confidentiality, compliance procedures and employee complaint procedures and is posted on our website

---

[1] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness about these allegations and related claims.

at http://ir.mammothenergy.com/corporate-governance.cfm.

54.     The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, its code of business conduct and Corporate Governance Guideline was not followed, as the Individual Defendants allowed false and misleading statements to be issued to the investing public, and failed to comply with laws and regulations, or conduct business in an honest and ethical manner.

## VI.     Fiduciary Duties

55.     By reason of their positions as officers and directors of the Company, each of the Director Defendants owed and continues to owe Mammoth and its stockholders' fiduciary obligations of trust, loyalty, good faith, and due care, and was/is required to use his utmost ability to control and manage Mammoth in a fair, just, honest, and equitable manner. The Director Defendants were/are required to act in furtherance of the best interests of Mammoth and its stockholders, to benefit all stockholders equally, and not in furtherance of their personal interest or benefit.

56.     Each director of the Company owed and continues to owe Mammoth, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

57.     The Director Defendants, because of their positions of control and authority as directors and/or officers of Mammoth, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Mammoth, each of the Director Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as

officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls, so that the market price of the Company's stock would be based on truthful and accurate information.

58.     To discharge their duties, the directors of Mammoth were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Director Defendants were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(b)     conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(c)     remain informed as to how Mammoth conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(d)     truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Duties Pursuant to the Company's Code of Conduct**

59.     The Director Defendants, as officers and/or directors of Mammoth, were also

bound by the Company's Code of Conduct[2] (the "Code of Conduct"), which "embodies the commitment of Mammoth Energy Services, Inc. (the "Company") to conduct their businesses in accordance with all applicable laws, rules and regulations and the highest ethical standards. "In particular, the Code of Conduct mandates that "All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls. Unrecorded or "off the books" funds or other assets should not be maintained unless permitted by applicable laws, rules and regulations."

60.    The Code of Conduct also provides "the Company's policy that the information in its public communications, including all Securities and Exchange Commission ("SEC') filings, be full, fair, accurate, timely and understandable. All employees and directors who are involved in the disclosure process, including the Chief Financial Officer and his staff, are responsible for acting in furtherance of this policy. In particular, these individuals are required to maintain familiarity with the disclosure requirements applicable to the Company and are prohibited from knowingly misrepresenting, omitting, or causing others to misrepresent or omit, material facts about the Company to others, whether within or outside the Company, including the Company's independent auditors. In addition, any employee or director who has a supervisory role in the Company's disclosure process has an obligation to discharge his or her responsibilities

---

[2] *See* Mammoth Code of Conduct:
http://ir.mammothenergy.com/static-files/d21fd66f-7ba5-4ec0-a53c-282d16900b9b

diligently."

61.     Further, the Code of Conduct requires, in part, the following:

Employees and directors should strive to identify and raise potential issues before they lead to problems, and should ask about the application of this Code whenever in doubt. Any employee or director who becomes aware of any existing or potential violation of this Code has an obligation to promptly notify the Company's compliance officer as shall be designated from time to time.

62.     In addition to these duties, Board members who served on the Audit Committee owed specific duties to Mammoth under the Amended and Restated Audit Committee Charter (the "Audit Charter").[3]  Specifically, they are mandated to:

to oversee the accounting and financial reporting processes of the Company and the audits of the Company's financial statements. In that regard, the Audit Committee assists the Board in monitoring (i) the Company's accounting, auditing and financial reporting processes generally, including the qualifications, independence and performance of the independent auditor, (ii) the integrity of the Company's financial statements, (iii) the Company's systems of internal controls regarding finance and accounting and (iv) the Company's risk management and compliance with legal and regulatory requirements. In performing its duties, the Committee shall seek to maintain an open avenue of communication among the Board, the independent auditor, the internal auditors (if any) and the management of the Company.

63.     The Audit Charter further requires the Audit Committee to oversee internal controls and risk management, including:

When the Company becomes subject to the SEC filing requirement with respect to management's report on internal control over financial reporting and the independent auditor's attestation of the Company's internal control over financial reporting, review and discuss with management and the independent auditor management's report on internal control over financial reporting and the independent auditor's attestation of the Company's internal

---

[3] *See* Audit Committee Charter at:
http://ir.mammothenergy.com/static-files/d0e35da8-6f1e-4bce-9271-7177ad3020f8

control over financial reporting prior to the filing of the Company's Form 10-K; Review and discuss with management and the independent auditor the Company's annual audited financial statements prior to the filing of the Company's Form 10-K, including disclosures made in Management's Discussion and Analysis of Financial 4 Condition and Results of Operations, and recommend to the Board whether the audited financial statements should be included in the Form 10-K; Review and discuss with management and the independent auditor the Company's quarterly financial statements prior to the filing of the Company's Form 10-Q, including disclosures made in Management's Discussion and Analysis of Financial Conditions and the results of the independent auditor's review of the quarterly financial statements; Discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles, and the judgments of each of management and the independent auditor as to the quality and appropriateness of the Company's accounting principles as applied in its financial reporting; Review and discuss with management and the independent auditor management's report on internal control over financial reporting and the independent auditor's attestation of the Company's internal control over financial reporting prior to the filing of the Company's Form 10-K; Review and discuss the reports required to be delivered by the independent auditor pursuant to Section 10A(k) of the Exchange Act regarding: all critical accounting policies and practices to be used; all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and o other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences; and Discuss with management and the independent auditor any published reports or correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or accounting policies.

## Breaches of Duties

64.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Mammoth, the absence of good faith on their part, and a reckless disregard for their duties

to the Company.

65.     The Director Defendants breached their duty of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to revenue recognition practices. The Director Defendants also breached their duty of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused Mammoth to incur substantial damage.

66.     The Audit Committee members had a duty to review the Company's earnings press releases and regulatory filings. The members of the Audit Committee breached their duty of loyalty and good faith by approving the improper statements detailed herein and failing to properly oversee Mammoth's public statements and internal control function.

67.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Mammoth, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of Individual Defendants' improper course of conduct, the Company is now the subject of the Securities Action that alleges violations of federal securities laws. As a result, Mammoth has expended, and will continue to expend, significant sums of money.

## DAMAGES TO MAMMOTH

68.     The improper accounting practices have exposed the Company to myriad

reputation and financial damages, including but not limited to:

    (a)  Possible restatements and goodwill impairments;

    (b)  Liability arising from securities fraud litigation;

    (c)  The loss of credibility with customers and suppliers; and

    (d)  Legal and accounting costs associated with litigation, investigations and restatements.

## DERIVATIVE ALLEGATIONS

69.    Plaintiff brings this action derivatively and for the benefit of Mammoth to redress injuries suffered, and to be suffered, because of the Director Defendants' breaches of their fiduciary duties as directors and/or officers of Mammoth, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

70.    Mammoth is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

71.    Plaintiff is, and has been continuously at all relevant times, a stockholder of Mammoth. Plaintiff will adequately and fairly represent the interests of Mammoth in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

72.    Plaintiff incorporates by reference and re-alleges each allegation stated above as if fully set forth herein.

73.    A pre-suit demand on the Board of Mammoth would have been futile and, therefore, is excused.  At the time of filing of this action, the Board consists of Director

Defendants Straehla, McCarthy, Heerwagen, Smith, Ross, Palm and Amron.  Plaintiff need only allege demand futility as to a majority of Director Directors who were on the Board at the time this action was commenced.

74.     Defendant Straehla is Wexford's affiliate and has been the Company's CEO and member of the Board since June 3, 2016. Straehla served as chief executive officer of the General Partner from February 2016 until October 2016. The General Partner was controlled by Wexford. The Company concedes that Straehla is not independent under Nasdaq listing standards.

75.     Defendant McCarthy has served as Chairman of the Board of Directors of Mammoth since June 3, 2016 and served as chairman of the board of directors of the General Partner September 2014 until October 2016. McCarthy joined Wexford in June 2008 and currently is a Partner at Wexford, therefore he cannot be considered independent. The Company concedes that Defendant McCarthy is not independent under Nasdaq listing standards.

76.     Defendant Heerwagen has been a director of the Company since January 2017. Heerwagen serves as Senior Vice President of Corporate Development and Strategy for Gulfport, one of the Company's controlling stockholders. Since joining Gulfport in May 2007, Heerwagen has served in multiple roles, including as the Director of Investor Relations and Corporate Affairs. Due to his affiliations with Gulfport he cannot be considered independent. The Company concedes that Defendant Heerwagen is not independent under Nasdaq listing standards.

77.     Defendant Amron has been a director of the Company since January 2019.

Amron is a Partner at Wexford Capital and serves as its General Counsel. Amron also served on the board of directors of the general partner of Rhino, from January 2010 until the sale of Wexford Capital's interest in Rhino to Royal Energy Resources, Inc. in March of 2016. Due to his affiliations with Wexford he cannot be considered independent.

78.     Defendant Palm has been a director of the Company since June 2017. Palm served as a director of Gulfport from February 2006 and as chief executive officer of Gulfport from December 2005, in each case until his retirement in February 2014. Due to his affiliations with Gulfport he cannot be considered independent.

79.     Demand is excused here because of all of the seven Director Defendants, individually and collectively, face a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.   Director defendants Straehla, McCarthy, Heerwagen, Smith, Ross and Palm also solicited the false and misleading 2019 Proxy.

80.     In complete abdication of their fiduciary duties, the Direct Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, inter alia, intended to make the Company appear more profitable and attractive to investors. Because of the foregoing, the Director Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile,

and thus excused.

**Audit Committee**

81.     Demand is otherwise futile with respect to the four members of the Audit Committee (Smith, Palm and Ross) because they face the risk of substantial liability stemming from their failure to oversee the Company's compliance with applicable accounting regulations despite their mandate to do so under the Audit Committee Charter.

**Additional Considerations**

**Non-Compliance with the Code of Conduct**

82.     In violation of the Code of Conduct, the Director Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in an accounting scheme to issue materially false and misleading statements to the public and facilitate and disguise the Director Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Directors failed to comply with the law. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

83.     Mammoth has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Mammoth any part of the damages Mammoth suffered and will continue to suffer. Thus, any demand upon the Directors would be futile. The Director

Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Directors can claim exculpation from their violations of duty pursuant to the Company's charter.  As a majority of the Directors face a substantial likelihood of liability, they are self- interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the stockholders of the Company. Accordingly, demand is excused as futile.

84.     The acts complained of herein constitute violations of fiduciary duties owed by Mammoth's Director Defendants, and these acts are incapable of ratification.

**Insurance Considerations**

85.     The Director Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Mammoth. If there is a directors and officers' liability insurance policy covering the, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Mammoth, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy

exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

86.     If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Mammoth to sue any other wrongdoers, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

87.     Thus, for all the reasons set forth above, all of the Director Defendants, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Director Defendants
### *for Violations of Section 14(a) of the Exchange Act*

88.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

89.     The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

90.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of

interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

91.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

92.     Under the direction and watch of the Director Defendants, the 2019 Proxy Statement failed to disclose material adverse facts about Mammoth's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Mammoth's subsidiary, Cobra, improperly obtained two infrastructure contracts with PREPA that totaled over $1.8 billion; (2) specifically, the contracts were awarded as the result of improper steering and not a competitive RFP process; and (3) as a result, Defendants' statements about Mammoth's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

93.     The 2019 Proxy Statement also stated that the Company's directors and employees, including its principal executive officer, principal financial officer, principal

accounting officer, and controller, or persons performing similar functions, are subject to the Company's Code of Conduct.  The 2019 Proxy Statement was also false and misleading because, despite assertions to the contrary, Mammoth's Code of Conduct was not followed, as the Director Defendants made and/or caused the Company to make the false and misleading statements discussed herein.

94.     In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2019 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the 2019 Proxy Statement, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

95.     The false and misleading elements of the 2019 Proxy Statement led to the re-elections of all of the Director Defendants which allowed them to continue breaching their fiduciary duties to Mammoth.

96.     The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2019 Proxy Statement.

97.     Plaintiff on behalf of Mammoth has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants
### *for Violations of Section 20(a) of the Exchange Act*

98.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

99.     The Individual Defendants, by virtue of their positions with Mammoth and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Mammoth and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause Mammoth to engage in the illegal conduct and practices complained of herein.

100.    Plaintiff on behalf of Mammoth has no adequate remedy at law.

### THIRD CLAIM
**Against Individual Defendants**
*for Breach of Fiduciary Duties*

101.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

102.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Mammoth's business and affairs.

103.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

104.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Mammoth.

105.    In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

106.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

107.    Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose: that: (1) Mammoth's subsidiary, Cobra, improperly obtained two infrastructure contracts with PREPA that totaled over $1.8 billion; (2) specifically, the contracts were awarded as the result of improper steering and not a competitive RFP process; and (3) as a result, Defendants' statements about Mammoth's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

108.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

109.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Director Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

110.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Director Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

111.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

112.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Mammoth has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

113.    Plaintiff on behalf of Mammoth has no adequate remedy at law.

### FOURTH CLAIM
### Against Individual Defendants
### *for Unjust Enrichment*

114.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

115.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Mammoth.

116.    The Individual Defendants either benefitted financially from the improper conduct or received unjust compensation tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Mammoth that was tied to the performance or artificially inflated valuation of Mammoth, or received compensation that was unjust in light of the Director Defendants' bad faith conduct.

117.    Plaintiff, as a stockholder and a representative of Mammoth, seeks restitution from the Director Defendants and seeks an order from this Court disgorging all profits—including benefits, performance-based, valuation-based, and other compensation—obtained by the Director Defendants due to their wrongful conduct and breach of their fiduciary duties.

118.    Plaintiff on behalf of Mammoth has no adequate remedy at law.

### FIFTH CLAIM
**Against Individual Defendants**
*for Waste of Corporate Assets*

119.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

120.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, engage in internal investigations, and lose financing from investors and business from future customers who no longer trust the Company and its products.

121.    Because of the waste of corporate assets, the Individual Defendants are each liable to the Company.

122.    Plaintiff on behalf of Mammoth has no adequate remedy at law.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Director Defendant as follows:

a.    Declaring that Plaintiff may maintain this action on behalf of Mammoth, and that Plaintiff is an adequate representative of the Company;

b.    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Mammoth;

c.    Determining and awarding to Mammoth the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

d.    Directing Mammoth and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect Mammoth and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and

guidelines of the Board; and

2. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

e.      Awarding Mammoth restitution from Individual Defendants, and each of them;

f.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

g.      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 5, 2019                    Respectfully submitted,

*/s/ William B. Federman*
William B. Federman, OBA #2853
**FEDERMAN & SHERWOOD**
10205 North Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone:  (405) 235-1560
Facsimile:  (405) 239-2112
Email: wbf@federmanlaw.com

**LEVI & KORSINSKY, LLP**
Gregory M. Nespole
Samir Shukurov
55 Broadway, 10th Floor
New York, NY 10006
T. 212.363.7500
F. 212.363.7171

*Attorneys for Plaintiff Bryce Kuhar*



55 Broadway, 10th Floor
New York, NY 10006
T:212-363-7500
F:212-363-7171
www.zlk.com

**VERIFICATION**

I, Bryce Kuhar, under penalties of perjury, hereby do declare that I am a plaintiff in the foregoing complaint, that I have read the complaint, and that the facts therein are true to my own knowledge, except to matters stated therein to be alleged upon information and belief, and as to those matters, I believe them to be true and correct to the best of my knowledge, information, and belief.

Signed:

 Print Name: Bryce Kuhar                    Date: 09/4/2019